# The Montgomery and West Point Railroad Co. *v.* Branch, Sons & Co.

*The Rights of the Creditors of a Private Corporation.*

1. *The legislature can not deprive the creditors of a corporation of their rights.*—The creditors of a corporation who are secured by mortgages of its property, acquire therein rights of which they can not be deprived even by an act of the legislature.

2. *When the charter of a corporation provides that a surrender of its franchises shall not affect the rights of creditors, the clause will be presumed to be for the benefit of unsecured creditors.*—When the charter of a corporation authorizes it to buy the property of another, and provides that such purchase or surrender of the franchises shall in no way affect the rights of the creditors of the company which sells, it will be presumed that such a clause was introduced for the benefit of the unsecured creditors.

3. *A private corporation is a trustee for the benefit of its creditors.*—A private corporation is a trustee of its property for the payment of its creditors, and afterwards for the benefit of its stockholders. During its existence and operation, its general creditors have no lien which will entitle them to sue it, in a court of equity; but its property can be subjected to the payment of its debts by actions at law.

4. *When a corporation can not be made answerable at law, a court of equity will seize its property for the benefit of its creditors.*—If without the payment of its debts, the property of a corporation is distributed among its stockholders, or transferred for their benefit to third persons, who are not *bona-fide* purchasers without notice; or if the corporation should be dissolved, or become so disorganized that it can not be made answerable at law, then a

court of equity will lay hold of its property and effects, and apply them to the payment of its creditors.

APPEAL from the Chancery Court of Montgomery.

Heard before the Hon. HURIOSCO AUSTILL.

The Montgomery and West Point Railroad Company, a corporation of the State of Alabama created by an act of the legislature, passed in the year 1843, had in the year 1870, one hundred and seventeen miles of railroad, and other property of great value. It was indebted at the same time to the amount of about two-thirds of that value. Its stock sold in the market at thirty cents on the dollar. Of its debt, the sum of about $766,000 was due upon and secured by first mortgage bonds, which had been issued in 1866; $254,000 were secured by a second mortgage, and the rest was due by income bonds, chiefly, and in part was floating debt.

The Western Railroad Company of Alabama, another corporation of this State, was chartered in 1860 to build and operate a railroad from Montgomery westward to Selma, a distance of about 45 miles; and the road was completed in 1870. This company was in debt to an amount about equal to, if not exceeding, the value of its property. The Georgia Railroad & Banking Company, and the Central Railroad & Banking Company, of Georgia, were indorsers of the bonds of the Western Rail Road Company.

The same companies, or persons who were officers of them, were owners also of enough of the stock of the Western Railroad Company, and became, in 1870, owners of enough of the stock of the Montgomery and West Point Railroad Company to control the management of these latter, and to elect the officers thereof.

Mr. Charles T. Pollard was president of both of the Alabama companies.

By the 21st and 22nd sections of the charter of the Western Railroad Company, it was authorized to "contract for the purchase of the Montgomery and West Point Railroad," with all its "outfits and property of every description." And the president and directors of the Montgomery and West Point Railroad Company, "upon such purchase being made by and with the consent of a majority of the stockholders in value," were authorized to surrender their charter to the Comptroller of Public Accounts; after which the railroad so purchased was to be incorporated with that of the Western Railroad Company, "and be governed by the provisions of this act in all respects as if said road . . . had been

constructed under its provisions." The statute further proceeds as follows: "The purchases herein provided for, or the surrender of the franchises, shall in no way affect the rights of the creditors of the company . . . whose road may be purchased; and its separate existence shall be continued as to all the rights and remedies of creditors; and the president of the company incorporated by this act shall be held in law, as to service of process, as the president of the other company."—Acts of 1859–60, pp. 259, 260.

In June, 1870, at a meeting of the stockholders of the Montgomery and West Point Railroad Company, the president (Mr. Pollard), after a statement of the condition of the company, and of the necessity it was under of raising money for repairs, proposed "to sell to the Western Railroad Company the Montgomery and West Point Railroad, with its outfit and property, the Western Railroad Company to assume the payment of all the outstanding debts of the Montgomery and West Point Railroad Company, and to issue its stock, share for share, in exchange for the capital stock of the Montgomery and West Point Railroad Company. It is really," (he continued) "only the consolidation of the two companies under the name and charter of the Western Railroad Company."

This was the proposal, and in recommending it to the stockholders, Mr. Pollard expressed the opinion that the company could not raise the money it needed, except by issuing third mortgage or income bonds, which would have to be sold at so low a rate that the policy would bankrupt the company. "This may be avoided," (he added) "by the sale of the road as I propose, to the Western Railroad Company, and the issue by that company, after the purchase, of second mortgage bonds for such an amount as may be required to fund the entire debt of both companies not provided for, and for the repair of the Montgomery and West Point Railroad. . . If the plans now submitted to your consideration are adopted, I believe in three years the company will be restored to its position before the war of a dividend-paying railroad."

In response, the stockholders passed a resolution approving of the recommendation made by the president in his report, to sell the railroad and property of this company to the Western Railroad Company, and authorizing the president and directors to make such sale, "under the provisions of the twenty-first and twenty-second sections of the charter of the Western Railroad Company upon the following terms:

The Western Railroad. Company to assume all the obligations of this company and to issue the capital stock of the Western Railroad Company share for share for the capital stock of this company now outstanding."

The board of president and directors of the Western Railroad Company expressed its agreement to the purchase by a resolution adopted the first day of August, "in accordance," as it says, "with the resolutions of the stockholders in convention this day, and under the authority of the twenty-first and twenty-second sections of the act incorporating this company." And the resolution declares that the company makes the purchase "and hereby assumes the payment of all the debts, obligations, and responsibilities of said Montgomery and West Point Railroad Company, and hereby authorizes and instructs the president to issue the capital stock of this company share for share for the capital stock of the Montgomery and West Point Railroad Company now outstanding, and to take possession of said Montgomery and West Point Railroad, with its outfit and property, on the first day of September; on which day said railroad, its outfit, and property will be incorporated in this company."

Other resolutions, not alleged to be by authority of the stockholders, were then adopted by the same board of directors, authorizing the issue on the 15th of September, 1870, of the company's bonds for $1,200,000 of that date, to be made payable on the first of October, 1890, and secured by "a mortgage on the railroad, outfit and equipment of this company, including the railroad, outfit and equipment of the Montgomery and West Point Railroad Company this day purchased." And it was further by the same board of directors, "Resolved, That the president is hereby authorized to exchange for and take up the second mortgage bonds of the Montgomery and West Point Railroad Company now outstanding for $254,000 with a portion of the $1,200,000, which he is authorized to issue so that that the second mortgage for $1,200,000 shall be the only second mortgage on the entire road, outfit and equipment of the company, and there shall be left only a prior lien to said second mortgage, a first mortgage of the Montgomery and West Point Railroad Company for $750,000, and a first mortgage of the Western Railroad Company of $600,000."

On the first day of September, 1870, the Western Railroad Company took possession of the purchased property without any deed; Mr. Pollard being president of both

[Montgomery & West Point R. R. Co. v. Branch, Sons & Co.]

companies. The surrender was also made of the charter of the other company to the State.

The bonds and mortgage, or trust-deed in the nature of a mortgage, for $1,200,000, were afterwards executed; and the bonds were indorsed or guaranteed by the Georgia companies. Some of the debts of the Montgomery and West Point Railroad Company were paid with them, but the greater part of the bonds were used in paying the debts of the Western Railroad Company, and in improving the road, &c. In 1870, at the instance of the Georgia companies, the trustees in the mortgage last aforesaid, filed a bill to have the entire road, its equipments, and all the property and franchises of the Western Railroad Company sold under that and the other older mortgages, made by both companies before the consolidation. And according to the record, a sale was made of the entire property together, under the decree of the Chancery Court of Montgomery county, in 1875.

The complainants in the present suit, were creditors and holders of unsecured income bonds of the Montgomery and West Point Railroad Company, before and at the time of the consolidation, and still are. But they were not, nor was that company, or any of its unsecured creditors made parties to the suit for a sale under the mortgages. And the complainants now claim that they are entitled to be paid out of the property of their original debtor, and had a lien thereon superior to that created by the trust-deed of September 15, 1870, executed by the Western Railroad Company after its purchase thereof.

On the final hearing of the cause, the court decreed "that the lien of the complainants is superior to that of the holders of bonds under the mortgage executed by the Western Railroad Company of Alabama after the purchase of the" Montgomery and West Point Railroad "by the former, so far as the property of the said Montgomery and West Point Railroad Company is concerned."

H. C. SEMPLE, and D. S. TROY, for appellants.—1. To construe a statute properly, we must look at the history of the country relating to this object, that we may discover the "reason of it, or the cause which moved the legislature to enact it."—Smith's Com. on Stat. Const. § 493; and this reason of the law is not to be confounded with the mind of it, which the reason helps us to discover.—Smith's Com. § 493.

2. Why was this power to purchase and sell given to their corporations by statute? Simply because being artificial persons they could do no act even as to their own property not authorized by statute. Natural persons owning the road could have made such arrangements for the purchase and sale of the road as their interests suggested. The statute has no broader scope than to relieve the artificial persons from the disabilities incident to their corporate character.

3. The complainants can claim relief only on one of three grounds, viz: *First*, that the act authorizing the sale limited the right to sell and purchase to a sale and purchase subjecting the property sold to charge or lien in favor of all the creditors of the selling company without respect to the intention of the parties to the contract, and independent of the agreed price or value of the property; *second*, because, by the terms of the contract of sale, a lien was reserved by the selling company; *third*, because, under the circumstances of sale, the law implies a lien in favor of creditors of the dissolved corporation, at the moment of its dissolution, in the nature of a vendor's lien.

The first ground has been considered. The second ground, the facts repel the idea that such a reservation was designed either by seller or buyer as against the contemplated mortgage; and as to the third ground, we answer the corporotion was never dissolved, and *is a party to the suit;* and the law never constructively raises a lien when the facts show the parties considered the question and actually waived it. The idea of a vendor's lien is that the vendee and subsequent purchasers from him with notice are trustees for the vendor, till purchase-money is paid; but if the vendor has agreed to take other security or waived the lien, there is no room for a constructive trust.—Story's Eq. §§ 1217–1219—and Lord Eldon in *Macreth v. Simmons*, 15 Vesey, 350, says: "It depends on the circumstances of each case whether the court is to infer that a lien was intended to be reserved."

4. The sole question then is whether the mortgage made of the transfer of property in controversy had the same effect on the rights of appellees as if it had been made before the transfer. The lien or equitable mortgage in favor of the appellees as unsecured creditors is of the Montgomery and West Point Railroad Company is asserted on four distinct grounds, viz; *First*, that the Western Railroad Company agreed to pay the debts of the Montgomery and West Point Railroad Company, in consideration of the transfer of the property, and this charge constituted a lien upon the prop-

erty ; *second*, that the property, or a portion of it, being real estate, is liable for the purchase-money, and payment of the debts of said corporation is part of the price, and appellees, as holders of such debts, have a vendor's lien on the property ; *third*, that the Montgomery and West Point Railroad Company is a dissolved corporation, and appellees as creditors of it have a lien on its assets ; and *fourth*, that the statute which authorized the sale and purchase preserved all the rights and remedies of the creditors of the Montgomery and West Point Railroad Company, and this in effect secured to them a lien on the property of the corporation.

5. It was entirely competent for the legislature to dissolve the corporation for certain purposes, and to continue its existence as to others.—*Rex v. Passmore*, 3 Term Rep's, 241, *et seq*. An authorized merger or transfer of corporate franchises to a new corporation by legislative act is not such a dissolution as will subject its assets to administration in a court of equity for the benefit of creditors.—Aug. & Ames on Corp. § 780—and a *fortiori* when a transfer is in accordance with a statute which continues the old corporation as to all the rights and remedies of its creditors, such a result will not follow.—26 Conn. 544 ; 28 Conn. 289 ; 21 Ill. 451 ; 25 Ill. 353 ; 46 N. Y. 644.

6. The statute which authorized the transfer did not confer on the creditors of the Montgomery and West Point Railroad Company any right of lien which they did not possess before the transfer of the property. On the contrary, it is expressly declared that the purchase shall in no way " affect the rights of the creditors of the company" whose road is purchased, intending thereby that the rights of creditors should be neither increased nor diminished. Hence, we respectfully submit, that the *lien* of appellees, so far as it is claimed to arise from this legislative enactment, is not even colorable. From the very nature of a corporation it is impossible that its general or unsecured creditors can have a lien on its assets which could be asserted in the event of its insolvency against a purchaser from it in good faith while solvent. The property in controversy was purchased from this corporation in good faith when it was solvent, and its unsecured creditors had then no rights which authorized them on its subsequent insolvency to impeach the title of the purchaser at such a sale.

7. The power to mortgage its property was expressly conferred on the Montgomery and West Point Company by its charter, and the legislature expressly reserved the right to

alter, modify or repeal the charter of the Montgomery and West Point Railroad Company; and where this right is reserved, the power of the legislature to amalgamate or consolidate corporations and to remits the creditors of each against the consolidated company is settled.—1 Redf. on Railw. p. 620, § 142, par. 6; 35 Wis. 425—578-9; 13 How. 307. Such consolidation or transfer of property is but the the substitution of another trustee supposed by the legislature to be more capable of carrying into effect the original objects of incorporation.

8. The power to mortgage the property in good faith for corporate purposes, one of which was to raise money to pay unsecured creditors, was not destroyed by amalgamation. This power remained somewhere, and but for the provisions of the act might have been exercised by the Montgomery and West Point Railroad Company after the consolidation. ·11 Ind. 398; 2 Redf. on Railw. p. 595, § 254. Therefore the appellees had clearly no lien on the property in controversy by mere operation of law, which would prevail over a sale and mortgage pursuant to it, made in good faith for corporate purposes and in accordance with legislative authority. The case in 42 Mo. 63, fully sustains this proposition.

9. Under the facts shown, it is not consistent with good faith on the part of the appellees now to insist that the lien in their favor is superior to the mortgage which they assisted in creating. As against this mortgage and those claiming under it they are clearly estopped.—49 N. Y. 336; 33 Ala. 509; 28 Ala. 321; 30 Ala. 408. If any of the complainants is not entitled to recover, the bill must fail.—1 Brick. Dig. p. 750, and authorities cited.

10. But we insist, upon well settled principles, the bill must be defeated on its merits. It may be .conceded that when the purchaser agrees to pay the debts of the seller he takes the property charged with the payment of the debts, the creditors have a vendor's lien on the property sold; but neither the *charge* nor *the* lien which are both implicated from the sale can prevail against a mortgage contemplated, intended, and provided for by both seller and purchaser in the contract itself.

WATTS & SONS, and PETTUS, DAWSON & TILLMAN, for appellees.—1. Under the facts of the case several important questions arise, viz:

1st. Was there any trust in behalf of the unsecured creditors of the Montgomery and West Point Railroad Com-

pany on the property transferred to the Western Railroad Company take this property subject to payment of the debts of the Montgomery and West Point Railroad Company? Was there not an equitable lien in favor of creditors on all the property thus transferred to the Western Railroad Company?

2d. Were Morris and Lowry *bona fide* purchasers for value without notice of the equities of the complainants, who are holders of unsecured bonds of the Montgomery and West Point Railroad Company, made in 1866 and 1870, before August, 1870?

3d. Whether the unsecured creditors of the Montgomery and West Point Railroad Company have not a vendor's lien on all the real estate belonging to the Montgomery and West Point Railroad Company at the time of the transfer in September, 1870. The creditors of this railroad company independent of the statute have an equitable lien.—3 Grattan, 148. Immediately upon the dissolution of a corporation, its creditors have a *lien* upon all its property. This trust is enforced against the property in the hands of all persons except *bona fide* purchasers for value without notice.—Perry on Trusts, §§ 241-242 ; 2 Story Eq. § 1252 ; Aug. & Ames Corp. § 599-600 and note ; 8 Pet. 281 ; 3 Mason C. C. Rep. 308 ; 25 Ala. 566 ; *Huckabee v. Smith,* 53 Ala. The act of the legislature authorized the Western Railroad Company to purchase the Montgomery and West Point Railroad and its property, and when such purchase was made the charter of the latter was to be surrendered. It became, *ipso facto,* dead—dissolved in law. It became dead as to all power of transacting business, and only existed as to the rights and remedies of its creditors.

2. When property is transferred to another on condition of paying some third person a debt, the latter acquires a lien on the property which can be enforced in equity. ˙ A trust is thus created on the property for the payment of the debt. 3 Grattan, 148 ; 2 Paige, 15 ; 7 Paige, 421 ; 6 Paige, 383. It matters not whether such condition be expressed or implied. 11 Paige 334, and authorities *supra.* Such a trust may be created by deed as well as by will.—2 Story Eq. §§ 1244–46 ; 3 Merivale, 382 ; 2 Spence Eq. 287 ; 7 Johns. Ch. 57 ; 6 Ala. 589 ; 23 Ala. 519. By the statute which authorized one railroad company to buy and the other to sell, coupled with the contract of purchase, created a trust in behalf of all the creditors of the Montgomery and West Point Railroad Company on all property so transferred, and the Western Railroad

Company took the property subject to this trust. A creditor of a dissolved corporation has a lien on all its property which he can enforce in a court of equity.—*Huckabee v. Smith*, 53 Ala. and authorities *supra*.

3. There is another ground upon which complainants are entitled to relief. The agreement to pay the debts of the Montgomery and West Point Railroad Company as a part of this consideration of the purchase, gives these complainants a lien on the real estate which belonged to the Montgomery and West Point Railroad Company. The debts constituted a part of the purchase-money.—48 Ala. 509; 1 Otto, 667. In this case no deed of conveyance was made to the Western Railroad Company. There must be a deed to convey title to real estate. An estoppel will not convey the legal title. 18 Ala. 182.

4. There can be no difference between a corporation and a natural person in this respect. Indeed if there be, a corporation has less powers than an individual.—48 Ala. 45; 43 Ala. 656; 28 Ala. 337; 42 Ala. 717; 49 Ala. 75. He who buys only an equitable title can not be considered a *bona fide* purchaser for value. To be such a purchaser he must have bought of one having a legal title.—2 Story Eq. § 1502; Sugd. on Vend. p. 211; 12 Serg. & Rawle, 389; 4 Johns. Chan. 46; 1 ib. 575; Leading Eq. Cases, p. 163; 7 Cranch, 34, 48; 7 Peters 252; 10 Peters 177; 8 Ala. 866. A vendee is held to examine the title of his vendor, and to know every fact which an examination would disclose.—18 Ala. 741; 42 Ala. 617; 4 Otto, 429.

5. Notice to Morris was notice to the persons whom he represented. He had implied notice. Implied notice of a trust is as binding as express notice, and an implied trust is as binding as an express trust.—4 Grattan, 482. A purchaser has notice of everything which appears on the face of the title purchased.—1 White & Tudor Eq. Cases, 153. The fact that the appellees have recovered a judgment against the Western Railroad Company which is unsatisfied, does not oust the jurisdiction of chancery to enforce the trust.—16 Wend. 460; 2 Ired. Ch. 316; 54 Ala. 246.

6. When two corporations consolidate their property, each owing separate debts before the consolidation, the separate property of each is liable first to pay the separate debts of each, and the surplus only is applied to the payment of the joint or common debts.—20 Ired. 457, 464. The same rule is applied to partnerships.—Story on Part. § 363; 19 Ala. 596; 24 Ala. 628; 27 Ala. 661; 29 Ala. 172. Corporations

[Montgomery & West Point R. R. Co. v. Branch, Sons & Co.]

can not legally form partnerships without special authority given them by statute.—Aug. & Ames on Corp. § 272; 7 Wend. 419; 3 Dessausure 557; 1 Sumn. C. C. Reps. 46. Even simple contract creditors may file a bill to assert an equitable lien against a dissolved corporation, and especially when a trustee is violating his trust and appropriating the trust fund to alien uses.—25 Ala. 337.

WADE KEYES, for H. B. Plant.—1. The act of the General Assembly which authorized the sale by one of the corporations, and the purchase by the other, was merely an enabling act. It certainly did not intend to give the Montgomery and West Point Railroad Company power or rights as a vendor which an individual vendor has not; nor did it intend to give the Western Railroad Company any exemption from the liabilities of an individual purchaser. There can be no controversy as to the existence of a vendor's lien on the real estate in favor of the creditors, when the consideration of the purchaser is the payment of the vendor's debts.—1 Otto, 672; *Buford v. McCormic*, December term, 1876. The law does not presume that a man has waived his rights. " To constitute a waiver there must be a clear, unequivocal and decisive act of the party."—3 Yerg. 286; 9 Haskill, 697; Redf. Railw. Cases (supplement), 73–4.

2. The Montgomery and West Point Railroad Company sold the whole of its property and surrendered its charter, and that was a dissolution, and nothing more nor less; and it is a perversion of terms to call it anything else.—Brice *ultra vires*, p. 538, 546. It is unnecessary to say anything in relation to a *bona fide* purchaser for a valuable consideration without notice in this or any other connection, as none of the elements of such a defence exist in this case.—31 Ala. 275.

3. The spirit of what was said by MANNING, J., in *Meyer v. Johnston*, 53 Ala. pp. 319–20, seems applicable to this case : " If such a mere accession of authority and change of name be allowed to operate a dissolution of one corporation and the creation of another in its stead, there would be danger that such changes by a process little different from that of simple development, would become not unfrequent devices by which bodies politic would continue to cast off the legal and equitable obligations from which the statute under which the arrangement in this instance was made, expressly declared that not anything in it contained should have the effect to release said company."

4. There are really no grounds for an elaborate brief in

this cause—not one at all proportionate in size to the amount involved. The principles upon which the appellees rely are too plain for serious contest. The defences are so unsubstantial that the very effort to grasp them proves them to be shadows. And it is apparent that instead of asking equity to "ungear," the appellees ask equity to drive the transaction on, harnessed as it is, to its legitimate consummation.

MANNING, J.—Those creditors of the Montgomery and West Point Railroad Company who were secured by mortgages of the company's property, by those contracts acquired rights therein, of which they could not be deprived even by an act of the legislature; since any law which a State may enact, that would impair the obligation of a contract, is void under the constitution of the United States. When, therefore, in the twenty-second section of the charter of the Western Railroad Company, it was enacted, in reference to the purchase of the property of the Montgomery and West Point Railroad Company, that "the purchases herein provided for, or the surrender of the franchises shall in no way *affect the rights of the creditors* of the company," the presumption is that the clause was introduced for the benefit chiefly of the unsecured creditors, persons to whom such a provision might be of advantage, rather than for those whose claims were already protected by deeds creating inviolable specific liens. And that this was the understanding of the contracting parties themselves is pretty clearly indicated by a passage in the report of Mr. Pollard, president of both of the companies, when, in addressing the stockholders of one of them, in reference to and before their union, in regard to what the other, the Western Railroad Company, ought to do,—he speaks of "the issue by that company, after the purchase, of second mortgage bonds for such amount as may be required to fund the entire debt of both companies, *not provided for,* and for the repair of the Montgomery and West Point Railroad."

The stipulation, also, in the resolution of the other company, by which it expressly "assumes the payment of all the *debts, obligations, and responsibilities* of the Montgomery and West Point Railroad Company," while persuasive evidence that the former understood its own charter as precluding it from becoming the absolute owner of the Montgomery and West Point Railroad Company, except upon that condition, also conclusively proves that the Western Railroad Company, and its wealthy backers, the two Georgia compa-

nies were convinced that the purchase would be a good one, on those terms.

2. It is argued, though, that the enactment declaring that the purchase of the railroad and other property of the West Point Company, and the surrender of its franchises, shall in no way affect the rights of its creditors, was intended only to preserve their rights to sue at law as they before might have done; and that the succeeding clause, continuing that company's separate existence, " as to all the rights and remedies of creditors," was intended only to enable them to bring such actions against it, by having process therein served on the President of the Western Railroad Company. The legislature did not (they say) mean to embarrass the transfer of the railroad and other property from one company to the other, by incumbering the same with liens which did not previously exist: but the Western Railroad Company acquired the property in the same plight that the Montgomery and West Point Company held it, and succeeded to the power of the latter to create a lien, by a second or third mortgage to secure bonds of a new issue, (that for $1,200,000), the holders of which would be entitled to enforce this security against and to the prejudice of the holders of the unsecured debt of the Montgomery and West Point Railroad Company. Let us examine these propositions.

No doubt, we suppose, is entertained by anybody, that the West Point road and property were acquired by the Western Railroad Company, in accordance with the intention of the legislature, when it enacted the twenty-first and twenty-second sections of the charter of the latter. The road purchased extends from Montgomery eastwardly, reaching Georgia by the main line at West Point, and, by a branch, at Columbus. A charter had previously been granted, to build a railroad from Selma westwardly, to the Mississippi State line; and the road and property of this company also, the Western Railroad Company was authorized by the same sections of its charter, to acquire; the design being to have one continuous railroad running from Georgia across the State of Alabama to the Mississippi State line in the direction of Jackson,—under the control of the Western Railroad Company and its charter,—and that the other companies when their roads were acquired should be disbanded. The charter of the Western Railroad Company provided that this corporation should be composed of the subscribers for its stock, and those whom they might at any time thereafter associate with them, their successors and assigns (Section 3);

and the stockholders and the capital stock might be added to and increased from time to time, until the latter should amount to $5,000,000 (Section 8).

It was evidently contemplated that the railroads of the other companies, if purchased at all, would be obtained by an agreement on their part, to unite their roads with that of the Western Railroad Company, and by their stockholders becoming stockholders in it. The word, *sale*, or *sell*, is not used at all in this connection, in the statute. The Western Railroad Company is authorized to "contract for the purchase" and to "purchase" those roads, or either of them; the word *purchase* being used as it often is in law, in the sense of acquiring by contract or consent, from another. And after the purchase, this company (the act proceeds to say), "may sue for and recover *in its name*, all *debts, dues* and *demands* from *any debtor to* said company whose roads may be so purchased:" which also contemplates a fusion or union of the companies and their stockholders.

In harmony with the evident intent of this enactment, the Western Railroad Company contracted for the purchase, and purchased, the railroad and other property of the Montgomery and West Point Company, by the agreement of the two, that the road, property, capital and effects of the latter should be added to those of the former, and that the stockholders of the latter should surrender their charter and become stockholders, to the same amount, in the Western Railroad Company: the transaction being, what Mr. Pollard defined it—" really, only the consolidation of the two companies under the name and charter of the Western Railroad Company." Thus, apart from the agreement by that company to pay "the debts, obligations and responsibilities" of the other, there was no consideration for the purchase so made,—except the issue of stock of the Western Company to the stockholders of the Montgomery and West Point Company; the only compensation actually made being received by them as stockholders. In other words, while they were thus paid with shares of the capital of the other company, no fund was created, or put at the disposal of the Montgomery and West Point Company, as the equivalent and substitute for the property it transferred, out of which it could be coerced to pay, or could pay one dollar to any of its creditors.

What, then, would it avail those creditors to bring actions at law against the Montgomery and West Point Railroad Company? If writs of sequestration or execution should be issued against it, where would there be any "goods and

chattels, lands and tenements" that could be seized by virtue thereof? Or should writs of *mandamus* be sued out for any purpose in such causes,—where would a board of directors be found, or persons authorized to perform the functions of such a body, on whom these writs could be served?

True, the act provides that the president of the Western Railroad Company "shall be held in law, *as to service of process*, as the president of the other company or companies, whose roads, works and property may be purchased." But he has no other capacity whatever in relation to the defunct Montgomery and West Point Railroad Company, and may have never had any connection with it during its existence, as a stockholder or otherwise. Nothing in fact remained of that corporation, except the name. And anything more vain and useless—than an action at law against it,—anything more absurd,—it would be difficult to conceive. We must, therefore, conclude that something more substantially beneficial to the creditors, than such suits would be, was intended by the clause of the statute professing to secure rights to them. What were the rights that might be so preserved?

3. A private corporation chartered to transact business, is a trustee of its capital, property and effects—first, for the payment of its creditors, and afterwards for the benefit of its stockholders. True, while it continues in life and operation according to the design of its charter, its general creditors have no specific lien which would entitle them to sue it in a court of equity. Yet during that time, its property and effects, which the law presumes would not be dishonestly put out of reach, are liable and might be subjected to the payment of its debts by actions at law against it, if not paid voluntarily. But if leaving its debts unpaid, its capital, property and effects are distributed among its stockholders, or transferred for their benefit to third persons who are not *bona fide* purchasers without notice,—and still more, if the corporation be dissolved or become so disorganized that it can not be made answerable at law, then a court of equity will pursue and lay hold of such property and effects, and apply them to the payment of what it owes to its creditors. *Mamma v. Potomac Co.* 8 Peters 28; *Dummer v. Wood*, 3 Mason, 308; *St. Mary's Bank v. St. John, Powers & Co.* 25 Ala. 566; *Huckabee v. Smith*, 53 Ala. 191. A suit having that object is the most direct, if not the only efficient means of asserting and vindicating any right of the creditors, in such a case as the present: and by holding that it is not maintainable, we should refuse to give any real effect to the sav-

ing clause in the statute, if such a clause was necessary to enable them to maintain the suit. Certainly, if by virtue of the act, one of the contracting companies might transfer all of its ample property and effects out of which its creditors ought to be paid, to the other and weaker company, in consideration of its admitting the stockholders of the former to become shareholders of its capital and property thus augmented, and might then—by a sort of legal suicide—slip out of existence, leaving those creditors to sue at law the surviving company, which they had never dealt with, or accepted as their debtor, their rights would be very seriously affected thereby.

4. There is no question of innocent purchaser for value without notice, in this case. No party-defendant can claim or does claim that character. The existence of the debts was not only known to the Western Railroad Company, but it expressly assumed to pay them all. And such an agreement coupled with the acquisition in the same transaction, of all of the property out of which they were payable, and a consequent dissolution of the debtor company to which the promise was made, would itself probably create a lien on the property acquired, as well as bind the Western Railroad Company personally, for the payment of these debts. *Vanmeters' Ex'rs v. Vanmeters*, 3 Grattan, p. 162.

We have no doubt, therefore, that the complainants in this cause, creditors of the Montgomery and West Point Railroad Company, have a lien for the payment of its debts to them, on the road and its appurtenances and other property that belonged to that company, superior to the lien created by the trust-deed or mortgage of September 15, 1870, executed by the Western Railroad Company.

5. There is no substance in the objection that Branch, Sons & Co. were stockholders at the time of these transactions. If there was any evidence that they participated in or approved of the transaction we have considered, it must be presumed that they did so understanding its legal effect; and by that, as we have seen, the rights of creditors were intended to be preserved.

The contention of appellants that in taking and stating the accounts between the parties, and in the decree, it ought to be provided that the amount of debt of the Montgomery and West Point Railroad Company, which was paid with the bonds issued by the Western Railroad Company, should be allowed and paid out of the proceeds of the sale of its property, before any payments should be made to complain-

ants, is not well founded. It ignores the fact that the Western Railroad Company expressly agreed to discharge all the debts, obligations and responsibilities of the other company—and that it was upon the condition that it should do so, that it acquired a property which, at the time, was worth much more than the debts chargeable upon it. The purchasing company can not now, nor, if it is not still the owner, can those claiming under it, because the property may have in their hands, gone down in value,—repudiate the obligations of the contract by which it was obtained.

We think there was no error prejudicial to appellants, in the proceedings below.

Let the decree of the chancellor be affirmed.

STONE, J., not sitting.

[On application for rehearing.]

MANNING, J.—We have carefully considered the application for a rehearing, on the last topic discussed in the opinion in this cause,—that, namely, concerning the division of the proceeds of the sale of the Montgomery and West Point Railroad and equipments. The principal argument upon which this contention of appellants is founded, rests on the assumption, that it was one of the terms of the contract between the two companies, that the Western Railroad Company should, after acquiring the property of the Montgomery and West Point Company, execute its bonds for the $1,200,000 mentioned, and its mortgage on the entire consolidated road and its appurtenances and equipment, to secure payment of them. We find no basis for this assumption in either the pleadings or the evidence. We infer from them both that there was no such provision in the contract. The terms proposed and accepted were clearly stated in the resolutions of both of the contracting parties at the meetings *of the stockholders of each:* and no such stipulation is set forth in either of them, although the members may have individually believed that the future policy suggested in the report of the president to the West Point Company, and in the resolutions of the board of directors of the Western Company, would be wise, nothing on that subject was introduced into the resolutions to sell and purchase, which were adopted at the respective stockholders' meetings. And that it was not the purpose of the board of directors of the Western Company to do this, is inferrible from the recital in

[Montgomery & West Point R. R. Co. v. Branch, Sons & Co.]

its resolution to purchase, and of the terms of the purchase, that it was adopted in accordance with the resolutions of the stockholders in convention this day :" while subsequent resolutions of the board relating to the issue of those bonds and execution of the mortgage, do not contain any such reference to the instruction of a stockholders' meeting. They appear to have been passed by the board of directors, in the exercise of their own powers of administration, and might have been rescinded or changed at its pleasure at any time. No liability was thereby incurred to anybody. And if there had been, the creditors of the other company had no part or voice in those negotiations. All the ingenious argument erected on the assumption referred to, is without any foundation.

But the able counsel for appellants further insist that, if it was not a part of the contract between the two corporations, that the Western Company should, execute the bonds and mortgage and thereby give to the holders of them rights in all that property superior to those of the unsecured creditors of the Montgomery and West Point Railroad Company,— yet these creditors knew that it was in contemplation, that such bonds and a mortgage to secure them, should be executed, and were afterwards executed; and that a large number of these creditors were paid therewith or with the money thereby raised; and that not having objected to the transaction, those who had not been paid, ought to be considered as having ratified it, and be estopped from claiming priority over the holders of these bonds.

" Whatever trusts or liens " (say those gentlemen) " arose by the transaction between the two corporations in favor of the Montgomery and West Point Railroad Company, were common to all of that class, and upon what principle can it be held that a portion of this class can accept the benefit of a mortgage on the property of both corporations, while another portion of the same class, who stand by and see it done, may assert against this mortgage a superior lien to it? We have seen that these unsecured creditors had a right to share the benefits of this mortgage. There is no allegation that Morris and Lowry, the trustees, or the parties who advanced their money on the bonds or any body else is to blame because the appellees did not, like their more fortunate or more diligent companions, get their debts funded under the mortgage, or paid in full with the money raised upon it."

But what right had the creditors of the Montgomery and West Point Railroad Company to ratify or refuse to ratify

[Montgomery & West Point R. R. Co. v. Branch, Sons & Co.]

the mode in which the board of directors of the Western
Railroad Company chose to transact the business of their
own corporation? What reason had such creditors,—in view
of the opinion of Mr. Pollard that the latter company should
by such an issue of mortgage-bonds, provide for " the entire
debt of both companies not provided for "—to anticipate that
they would *not* " get their debts funded under the mortgage
or paid in full with the money raised upon it?" And where
is there any allegation or suggestion in this cause, that they
have any of them refused to be " paid in full with money
raised upon" said mortgage, or by any other means to which
the Western Railroad Company might resort in performance
of the duty it undertook, when it declared that it " hereby
assumes the payment of all the debts, obligations and respon-
sibilities of said Montgomery and West Point Railroad Com-
pany?"

We are not able to perceive any such inconsistency or
injustice as counsel imagine, in holding, that those of the
unsecured creditors of the Montgomery and West Point
Company, or of the second mortgage creditors of the same
company, who released their debts against it, in exchange
for the bonds of the issue of $1,200,000 of the Western Rail-
road Company, indorsed as they were by two wealthy Geor-
gia companies, are not entitled to a division of the proceeds
of the property which belonged to the Montgomery and
West Point Company with the creditors of that company.

Those who made this exchange, ceased to be creditors of
the latter company, and obtained securities which they pre-
ferred, and which were probably more valuable than those
they parted with. It is not they who complain of being in
a worse condition by that transaction, or of injustice on the
part of the appellants, who were defendants below—but ap-
pellees, the suing creditors, who complain that they have not
been paid either by those indorsed bonds or otherwise.

Let the application for rehearing be overruled.

STONE, J., not sitting.