Minshall, J.
The principal grounds upon which the plaintiff asserts his right to relief are — (l)the provisions of the statute under which the proceedings in consolidation were had; (2) the stipulation in the agreement forming the basis of the consolidation; and (3) the mortgage executed by the new company in 1867, known as the consolidated mortgage.
I. The bonds owned by the plaintiff, amounting at their face value to $150,000, were issued by the Toledo & Wabash Railway Company in 1862, were unsecured by mortgage on the property of the company, and the entire series, of which they were part, were denominated convertible equipment bonds, and amounted to $600,000, payable in 1883, bearing interest at the rate of seven per cent., payable semi-annually, with the usual coupons attached. The company had been formed by the consolidation of the road of a ’company in Ohio with *613 one of a company in Indiana, under the laws of these states, and its road extended from Toledo in the former, to State-Line city in the latter, state. It operated its road until in 1865, when' it was consolidated with certain other roads in the state of Illinois, the new company thus formed taking the name of the Toledo, Wabash & Western Railway Company.
The consolidation was had under the laws of the several states -in which the constituent roads were located, the statute in this state applicable to the transaction being the act of April 10, 1856. (1 S. & C. 327.) The act required that an agreement forming the basis of the consolidation should be presented to the stockholders of the respective companies at separate meetings called for that purpose upon due notice; and then provided that upon its adoption by a vote of two-thirds of the stockholders, the filing of the agreement with the requisite certificate of its adoption, by the secretary of each company, in the office of the secretary of state, and the election of directors by the stockholders of the new company, the consolidation should be deemed complete, and that all the rights, privileges and franchises and all the property of every description “of each of the corporations, parties to the same * * * shall be deemed to be transferred and vested in such new corporation without further act or deed,” with this express proviso, “ that all rights of creditors, and all liens upon the property of either of said corporations, shall be preserved unimpaired, and the respective corporations may be deemed to be in existence to preserve the same; and all debts, liabilities and duties of either of said companies, shall thenceforth attach to said new corporation and be enforced against it to the same extent, as if said debts, liabilities and duties, had been contracted by it.” Whilst the Indiana statute is not so definite in its provisions as to the rights of creditors of the constituent companies as our own, yet an effect has been given it by the construction of its courts, that is substantially the same. McMahan v. Morrison, 16 Ind. 172; Indianapolis, C. & L. R. Co. v. Jones, 29 Ind. 465.
What, then, is the sum of the rights of creditors that, as against proceedings had under it, are to be preserved unim *614 paired? It is true that, ordinarily, a creditor has no right that will interfere with that of bis debtor to sell and dispose of his property for a valuable consideration, unless be has taken the precaution to acquire some lien upon it, by mortgage or otherwise, as a security in his own behalf. As a rule the right of an unsecured creditor is confined to the personal obligation and the undisposed of property of his debtor; still it is not strictly accurate to say that such creditor has no claim upon the property of his debtor, for in one sense, all the property owned by a debtor, unless exempt by statute from sale on execution, is subject to the claims of his creditors, and he cannot dispose of it, unless for a valuable consideration, so as to defeat this right. It is upon this principle that relief is constantly afforded creditors in equity against conveyances in fraud of their rights. Hence the right of a creditor, though unsecured, to maintain an action for a personal judgment, is not the sum of his rights. These may arise from a variety of circumstances, conferring not merely a right to a personal judgment for money, but to have it satisfied from certain specific property formerly owned by the debtor, irrespective of its acquisition by others. The decease of the debtor, assignments made by him, his bankruptcy, loss of the power to own and acquire property, as, for example, the dissolution of a corporation, or the civil death' of the debtor, are some of the most frequent instances in which this right of the creditor has been recognized.
But the question presented here is not general, but special: It is, what are the rights of unsecured creditors of an incorporated railway company whose entire road and property have been transferred to a new company, formed by its consolidation with other roads under the laws of this state ? The general doctrine that all the property of a corporation is a trust fund for its creditors, and that upon its dissolution they, have the right to require that it be applied in payment of their claims, is not controverted by the defendants. There seems to be no conflict in the authorities as to this, and that the right gives rise to an equitable lien upon the property in favor of the creditor, that is superior to the claims of every one but purchasers for value without notice. Story Eq. Juris, sec. *615 1252; 2 Kent Com. 307 and note “ b;” Mor. Priv. Cor. §§ 780 and 1035; Mont. & West Point R. Co. v. Branch, 59 Ala. 153.
Nor can there be much question but that by consolidation the prior companies are extinguished for all purposes except to preserve the rights of their creditors, for which purpose they “ may,” in the language of the law, “be deemed to to be in existence.” The observation of Mr. Justice Swayne, in construing this statute in Shields v. Ohio, 95 U. S. 319, that, “it was a condition precedent to the existence of the new corporation that the old ones should first surrender their vitality and submit to dissolution ” is quite accurate.
It is, however, claimed by the defendants that no new rights are conferred by the statute upon creditors; that if they were unsecured before, they remain such after, the consolidation; and that the new company may deal with the property — may sell or mortgage it — as could have been done, and with like effect, by the former company had it continued the owner thereof. This argument is placed upon two grounds, (1) the assumption that the transaction is analogous to a sale, and, (2) that such is the effect of the statute upon all contract made subsequent to its passage. We will consider them seriatim.
1. The first is, as we think, certainly erroneotts. Whilst the transaction has some of the features, it is wanting in the essential elements of a sale. A sale implies a vendor and a vendee, and by it the former sells and transfers a thing that he owns to the latter for a price paid or to be paid to himself. The vendor parts with nothing but his property, and for it receives a quidpro quo. Such is not the case where companies are consolidated under this statute. It is true that the owner of each constituent road parts with its property. But it does much more; it not only parts with its property, but ceases to be a juristical entity, capable of owning or acquiring property. It does not, and could not receive any consideration for the transfer, because it is extinguished and dissolved by the act of its stockholders in assenting to the proposed agreement. It is futile to urge that the consideration is received by the stockholders. They are not the corporation, nor do they represent *616 it in its relation to its creditors. “ An essential incident of corporations is that their rights are not vested in the aggregate of individuals, but in the ideal whole, regarded as distinct from the members of which it is composed.” Per Mr. Poste in his edition of Gaius, 154. And see, Bank of Augusta v. Earle, 13 Pet. 519, 587. There has. been no relaxation of this principle in its application to the relation of an incorporated company to its creditors. It is the owner in law and equity of all its corporate property, and it, and not the stockholders, is the debtor in all corporate obligations. Mor. Priv. Corp. 2 ed. § 227. Moreover, in a consolidation of companies, the stockholders receive no part of the property or assets of their respective companies; these pass to the ownership of the new company. All that the stockholders of either of the old companies receive, is stock in the new company in exchange for what they held in the former company. "We must look elsewhere for analogies to the transaction whereby, through consolidation, a new company acquires the property of certain old ones. "We are not without such analogies. They" are to be found in the numerous instances in ancient and modern law, where, to use the terminology of the Eoman civil law, a universitas juris is transferred. The term expresses the legal conception of a university or bundle of rights and liabilities, belonging to one person and constituting, as it were, his legal personality; and where these are transferred by one- and the same act to another, the latter is said to acquire per universitatem, that is, he becomes clothed with the rights and legal duties of the individual to whose personality he succeeds. Among some of the leading instances of such acquisition arc — (1) a succession to an inheritance by an heir — -somewhat obscured in the common law by its division between the heir and the personal representative of the deceased (Maine Anc. Law, 180); (2) where, by adrogation, one not under power became the son of another, and the adrogator by the diminution of the status of the adrogatus, or adopted son, acquired his property and, by praetorian law, became liable for his debts to the extent of the property so acquired; (3) coemption, where the husband acquired, by the marriage, the property of the wife, and by a remedy furnished *617 by the praetor, was made liable for her debts in the same manner as in the case of adrogation. And in the common law may be suggested, not merely the case of an inheritance transmitted by the death of the ancestor, but also the estate of one regarded as eiviliter mortus, which was transmitted and administered upon as that of a person in fact deceased. And the succession of an assignee in bankruptcy to the entire property of a bankrupt is, as observed by Sir Henry Sumner Maine, a modified form of a universal succession. And, he says: “ Were it common among us for persons to take assignments of all a map’s property on condition of paying all his debts, such examples would exactly resemble the universal successions known to the oldest Roman law.” Maine Anc. Law, 180.
In all these cases the point most to be observed, is the extreme care of the law to secure the rights of creditors. The case of an inheritance is familiar and needs little or no comment — the creditors of the deceased are regarded as having a lien upon the property of the deceased, and this is secured to them through the methods of administration; and so in the case df those regarded as being civilly dead, for example in the case of a monk, the • individual, in anticipation of becoming a “ monk professed,” could make a will and appoint his own executor, but if he did not, administration was awarded by the ordinary as upon the estate of one in fact deceased. 1 Bl. Com. 132. For some reason, not well understood, neither the adrogator nor the husband in a marriage by coemption was, by the ancient civil law, liable to creditors for the debts of the person thus reduced to his power. But a remedy was provided at an early period through an action given by the praetor, in which, by a fiction, the former status of the debtor was deemed to continue, and this, like all fictions introduced to favor the remedy, could not be disputed, and preserved the rights of the creditor as against the property of his debtor. Poste’s Gaius Inst. bk. 3, § 84; Id. bk. 4, § 38, and comments by Poste, p. 521; Just. Inst. bk. 3, tit. 10, §§ 1—3 ; and Hunter Rom. Law ( 2 ed.), 741. And it is worthy of note in this connection that our statute regulating proceed *618 ings in consolidation, provides that, to preserve the rights of creditors, “ the respective corporations may be deemed to be in existence.” It thus appears to be a principle of universal law that the death, real or supposed, of an individual, possessed of property and owing debts, gives to his creditors a right to have his property aj:>plied to the satisfaction of their claims. It is a misapprehension of the doctrine to say that its application to the consolidation of railway companies, would make every consolidation an assignment for the benefit of creditors. The new company does not take the property as assignee, but in its own right, subject only to the payment of the debts of the constituent companies. This liability is created by statute and the lien results as a consequence. It is not a jus in re, nor a jus ad rem, but a charge in the nature of an equitable lien upon the property available against all purchasers with notice. 3 Pom. Eq. Jur. § 1233 and note 3. The reason underlying the principle upon which the law proceeds in all this class of cases, is, that the debtor does not merely part with his property and rights, but also loses his capacity to own and acquire property ; and all that is left the creditor upon which he trusted his debtor — property constituting the principal ground of credit in all cases — is the property that his debtor owned, and to that he has the right to look for the satisfaction of his claim, the person whom he trusted having ceased to be. It is no answer to this to say that the new company is required to assume the payment of the debts of the old companies. I am aware that the convenience of trade and commerce has so changed the ancient doctrines of the common law, that a debtor may be required in a variety of instances to accept as a creditor one with whom he did not in fact contract; but I know of no instance in which it can be said that a creditor can be compelled to accept a new debtor in the place of the one to whom he extended credit. It is impossible to perceive how this could be done without imparing the obligation of the contract. The company with which he dealt- may have possessed ample means to discharge all its debts; the new one may, by reason of the debts of the other companies, bo hopelessly insolvent, and to compel him *619 to accept it as a general creditor., might be but another mode of robbing him of his credits.
2. The claim is, however, that such is the effect of the statute under which the consolidation was had, and having been in force at the time the equipment bonds were issued, entered into the contract and became a part of it. It is difficult to perceive how this claim can be maintained in the face of the language of the statute heretofore quoted, “ that all rights of creditors * * of either of said corporations shall be preserved unimpaired.” There is no question but that every statute enters into and forms part of any contract to which it is applicable as a part of the law of the land; but it is not perceived how, in the application of this rule, a contract may be impaired, or in any way affected, by proceedings had under a statute, which by its terms excludes any such effect. The proposition involves a contradiction in terms. The only question that can be raised in such case is, whether a particular effect claimed for a proceeding had under the statute will or will not, impair the contract of a creditor, and an answer to the question in the affirmative, must be fatal to the claim. No reason is perceived why a different intention should be imputed to the legislature in the enactment of this law. The object of the legislature in authorizing the consolidation of railway companies was, as we apprehend, not to enable the new company to obtain credit by impairing the security of existing creditors of either of the former roads, but to enable existing companies to unite and form a continuous line of railway under one corporate management, between widely separated points of trade and commerce; and as this may be attained without impairing the rights of creditors of the constituent roads, a court might well hesitate to so construe the statute, if its provisions were silent on the subject. It would seem to be quite as consistent with a wise public policy to preserve the foundations of commercial credit, as to promote the formation of great lines of inter-state, commerce • both may be necessary to the interests of commerce, but the one not more than the other.
*620 This view is much strengthened by the further provision as to the rights of creditors, that “ the respective corporations shall be deemed to be in existexxce to preserve the same.” Plow, for this purpose, shall they be deemed to be in existence —as legal entities with, or without, property ? Manifestly in the former sense, for the existence of a corporate entity without property wherewith to answer claims against it, would be of no avail to a creditor; a judgment against it would be without fruit. The clause was inserted in the interest of credit- or’s ; and the only interpretation that can be of any avail to them, cannot be rejected without doing violence to well settled x’ules of consti’uction. The statute introduces a fiction, much as the praetor did in- favor of the creditor’s of an adrogatus, and we see no reason why it was not intended to. answer substantially the same purpose. In a suit by a creditor, the company, though in fact dissolved, is to be deemed in existence, and a judgment in his favor*, whether against it or the new company, is to be satisfied from the property owned by the old company at the time of consolidation as if such proceedings had never been had; the fact of consolidation is pushed aside, and no one will be permitted to question the fiction until his rights have been satisfied. Of this no one, as a creditor of the new company, can in justice complain. The lien is a result of the proceedings under which the new coixxpany acquired its title to the property; and, of it, creditor’s of the new company have, in law, the same notice they have of prior mortgages upon the same property.
The former decisions of this court do not affect the question as to the rights of creditors. They are simply to the effect that the statute becomes a part of all subscriptions to the capital stock of a company made subsequent to its passage, so that the same may be recovered iir a suit by the consolidated company brought for that purpose. Mansfield, Caldw. & L. M. R. Co. v. Brown, 26 Ohio St. 223. The rights of a stockholder are preserved by giving him an election to become one in the new company, or of declining, and being paid the highest market value of his stock at any time within the six months next preceding the making of the agreement, but unless he does so previous to *621 the consolidation, he is treated as a stockholder in the new company; and this fact accentuates the construction claimed for creditors; as no voice is given them in the transaction, it is but reasonable that their rights should be in no way effected by it.
II. The plaintiff does not, however, base his claim to relief solely upon the provisions of the statute, but likewise, upon the effect of the stipulation in the agreement forming the basis upon which the consolidation was had, that the class of bonds owned by him should be protected, both as to interest and principal, as the same should mature, by the new company. The principle upon which this claim is based is, that where property is transferred upon the condition that the grantee shall pay some third person a debt or sum of money, the latter acquires an equitable lien on the property to the extent of the debt or sum of money to be paid him. This principle is well recognized and has been applied in a great variety of cases. A masterly treatment of the doctrine by Ranney, J., will be found in Clyde v. Simpson, 4 Ohio St. 445. See also, Story Eq. Juris., § 1244-6; Pom. Eq. Juris., § 166 and § 1234; Montgomery & West Point R. Co. v. Branch, 59 Ala. 139; Hamilton v. Gilbert, 2 Hiesk. 680; Vanmeter v. Vanmeter, 3 Grat. 148.
It is true that most of the instances in which this lien has been recognized is where property had been devised charged with the payment of debts or legacies to others, and for the plain reason that the most frequent occasions for its application will arise in such instances, and not because the principle is in its nature inapplicable to other transfers of property; for, as is said by Ranney, J., in Clyde v. Simpson, supra, a “doctrine resting upon the broad foundations of justice and conscience ” cannot be made “ to depend upon the manner in which the title is derived.” No such limitation has been placed upon the doctrine by the courts or text writers. Story Eq. Juris., § 1246. In Vanmeter v. Vanmeter, supra, it appears that a grantor had made a conveyance of all his real estate in consideration of one dollar and the agreement of the grantees to pay his debts *622 and a certain legacy; this was held by the court to constitute a lien upon the property in favor of the creditors. Many similar instances will be found among the cases cited; and, independent of the provisions of the statute, we are unable to see why the principle, when applied to the facts of this case, does not create a similar lien in favor of the holders of these equipment bonds. It would seem to follow as a corollary from what has been said as to the lien based upon the provisions of the statute. Whatever may be urged against the claim that the agreement to protect these bonds imposed the- duty of securing them by mortgage or otherwise, the least that can be claimed for such agreement is, that it imposed the duty of paying them, interest and principal, at maturity. And, as all the property of the company issuing them was tranferred upon the basis of this agreement, the transfer was, at least, upon the stipulation to pay his claim, as a part of the consideration thereof. If, for the purpose of withdrawing from the cares of business, or any other reason, a private person were to make a conveyance of all" his property to another upon the agreement of the latter to pay his debts, it will not be questioned but that such transfer would create an equitable lien upon the property in favor of creditors, that would avail against all persons with notice. This case is every way analagous to such a transfer’, and no reason exists why it should not be governed by the same principle so far as the rights of creditors are concerned. The only difference between the real and the supposed case strengthens the reason of its application to the real one. In the supposed case the person making the transfer may still own and acquire property, but' in the real one, as heretofore shown, the debtor terminates its personality, and can no longer own or acquire anything; all that is left the creditor is the property that it owned; and, unless we disregard all the analogies of the law, this property must be charged with its debts in the hands of one that succeeded to its place in consideration of the agreoement to pay them, and the lien so created must be superior to the title of all purchasers with notice.
*623 In tlie decree for the foreclosure of the mortgage executed by the consolidated company in 1873, know as the Gold Bond Mortgage, it was ordered that the sale of the road, etc., should be made “without prejudice to any claim which may be made by the holders of bonds called equipment bonds, referred to in the petition,” (being the class of bonds owned by the plaintiff,) and that as to these, all questions arising were to be “left open.” So that, as the Wabash, St. Louis & Pacific Eailway Company, derives its title to the property and road against which the plaintiff asserts his rights, under the purchase made by Ellis and his associates at the judicial sale in which this reservation was made, it follows that whatever rights the plaintiff had as against the Toledo, Wabash & Western Company and its creditors, may be asserted against the Wabash, St. Louis & Pacific Company, and those claiming under it. No question of laches can arise, as the princpal of the bonds did not mature until 1883, or after the bringing of this suit.
It seems, therefore, unnecessary to consider whether the plaintiff is entitled to the benefit of the security known as the consolidated mortgage, executed by the Toledo, Wabash & Western Eailway Company, in 1867, for the purpose of retiring its bonded indebtedness. This has been constantly refused the holders of these equipment bonds; and as they are now due, the plaintiff is entitled to a finding of the amount duo upon the bonds held by him, and an order for the sale of so much of the road as is within the jurisdiction of the court, unless paid in a short time to be named.
The conclusion here reached finds direct support in the cases of the Montgomery & West Point R. Co. v. Branch, 59 Ala. 139, and Tysen v. Wabash Ry. Co. 15 Fed. Repr. 763 and in the text of section 809 of Morawetz on Corporations. In a note by the reporter to Tysen v. Wabash Ry. Co., it is said that a motion for a rehearing was overruled by Justices Wood and Harlan. An effort has been made to distinguish the Alabama case on the suggestion that in it the indebtedness may have been contracted before the passage of the statute under which the consolidation had taken place. But this is not correct, as *624 tbe statute was passed in 1860, and the indebtedness was contracted in 1866 and 1870. Our conclusion is, however, oj>posod by the decision of the .supreme court of the United States in the Wabash, St. Louis & Pacific Ry. Co. v. Ham, 114 U. S. 587. Bespect for the authority of that court has delayed the decision in this case from the time it was reached upon the docket — over a year since; but, after the most careful consideration, we are unable to adopt its conclusions ; and, in construing a statute of our own state, deem it our duty to adopt that construction which, in our judgment, most accurately expresses the intention of the legislature.

Judgment for the plaintiff, finding the amount due him and order of sale.